UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MELISSA CUBRIA § | |
| § | |
| PLAINTIFF § | |
| § | |
| V. § | CIVIL ACTION NO. 1:16-cv-544 |
| § | JURY |
| UBER TECHNOLOGIES, INC. § | |
| § | |
| DEFENDANT § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

### INTRODUCTION

1. This class action lawsuit arises because Uber has violated the TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 ("TCPA") by robo-texting thousands of unwanted text messages to the cell phones of thousands of Uber users in Austin, Texas—all without the prior express consent of those receiving Uber's text messages—as part of a political campaign by Uber to oppose mandates from the City of Austin which impose various background check procedures for Uber drivers.[1]

---

[1] The specific ballot measure which Uber supports (along with fellow ridesharing service Lyft) for the May 7, 2016 special municipal election in Austin is called "Proposition 1". The language of Proposition 1 is as follows:

PROPOSITION. 1, CITY OF AUSTIN "Shall the City Code be amended to repeal City Ordinance No. 20151217-075 relating to Transportation Network Companies; and replace with an ordinance that would repeal and prohibit required fingerprinting, repeal the requirement to identify the vehicle with a distinctive emblem, repeal the prohibition against loading and unloading passengers in a travel lane, and require other regulations for Transportation Network Companies?"

http://traviscountyclerk.org/eclerk/content/images/sample_ballots/2016.05.07/2016.05.07_Cities_Schools.pdf

1

Accordingly, Plaintiff files this Original Complaint and respectfully shows the Court as follows:

## PARTIES

2. Plaintiff Melissa Cubria is an individual citizen of the State of Texas and an Uber account holder who resides within the city limits of Austin, Texas.

3. Defendant Uber Technologies, Inc. ("Uber") is a corporation that is organized and incorporated under the laws of the State of Delaware and is conducting business in the Austin Division of the Western District of Texas. Defendant may be served with process by serving its registered agent: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## JURISDICTION AND VENUE

4. Pursuant to 28 U.S.C. § 1331, this Court maintains federal question jurisdiction over this action, as this case arises under federal law, specifically the TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 ("TCPA").

5. Venue is proper in the Austin Division of the Western District of Texas

---

As the AUSTIN AMERICAN-STATESMAN recently explained, "Austin voters casting their ballots on Prop 1 have two choices:

"**For the ordinance**" is a vote for the Uber- and Lyft-backed measure, which removes the city requirement for fingerprint-based criminal background checks of drivers, among other things. Passage of Prop 1 would allow the ride-hailing companies to use the name-based background checks they prefer.

"**Against the ordinance**" is a vote to reject Uber's and Lyft's proposal, which keeps the city's rules in place." *See* http://www.mystatesman.com/news/news/local-govt-politics/uber-lyft-spending-now-at-81-million-in-prop-1-rac/nrD98/

because all or a part of the events giving rise to the cause of action asserted herein took place in the Austin Division of the Western District of Texas, and because Plaintiff resides in the Austin Division of the Western District of Texas.

## FACTS

6.      Plaintiff bring this class action complaint for damages, injunctive relief, and any other available legal or equitable remedies, resulting from the illegal actions of Uber in sending robo-text messages to Plaintiff and other Uber users in Austin, Texas on their cellular telephones, in violation of the TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227 et seq. ("TCPA") and Plaintiff's privacy rights.

7.      Plaintiff is an Uber rider and account holder with Uber.  As a condition of setting up her account with Uber, Plaintiff was required to provide her cell phone number to Uber.

8.      Plaintiff resides in the city limits of Austin, Texas.

9.      Since its adoption in 1991, the TCPA has placed limits on all autodialed calls (text messages are considered "calls" under the TCPA as interpreted by the Federal Communications Commission) to wireless numbers.  The FCC's corresponding rules (*see* 47 C.F.R. § 64.1200) governing automated telephone calls set forth restrictions that govern the use of automatic telephone dialing systems including those that deliver text messages.  These provisions apply to ***all*** autodialed texts, including those made by political campaigns or those undertaking political advertising or telemarketing.  *See* FCC Enforcement Advisory No. 2016-03.

10.     The TCPA, makes it "unlawful for any person within the United States . . . to

make any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice" to any telephone number assigned to a cellular telephone service unless in an emergency or with consent of the recipient of the call.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  Thus, the TCPA exists to prevent communications like the ones described within this Complaint, and to protect the privacy of citizens like the Plaintiff.  The legislative motivation and purpose behind the passage of the TCPA has been described by the United States Supreme Court as follows:  "Voluminous consumer complaints about abuses of telephone technology—for example, computerized calls dispatched to private homes—prompted Congress to pass the TCPA."  *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

11.     When it passed the TCPA, Congress intended to provide consumers a choice as to how telemarketers may call them and found that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer." Pub. L. No. 102–243, § 11. Congress also found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call . . . " *Id.* at §§ 12-13.

12.     The TCPA's ban on telephone calls made using an automatic telephone dialing system ("ATDS" or "autodialer")[2], as defined by 47 U.S.C. § 227(a)(1), has been interpreted to extend to unsolicited autodialed text messages sent to cellular

---

[2] An autodialed call is any type of call or message, including a text message, that is made by an "autodialer" or "automatic telephone dialing system," which is "equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers."  *See* 47 U.S.C. § 227(a)(1).   The FCC has emphasized that this definition covers any equipment—including predictive dialers—that has the specified capacity to dial numbers without human intervention whether or not the numbers called actually are randomly or sequentially generated or come from calling lists.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,

phones.  *E.g.,* FCC Declaratory Ruling, 27 F.C.C.R. 15391, 2012 WL 5986338 (Nov. 29, 2012); *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876 (9th Cir. 2014); *Gager v. Dell Fin. Servs., Inc.*, 727 F.3d 265, 269 n.2 (7th Cir. 2013).

### UBER'S OPPOSITION TO FINGERPRINT-BASED BACKGROUND CHECKS

13. In December 2015, the City Council of Austin, Texas put into city statutes mandatory fingerprint-based background checks for ride-hailing drivers such those who drive for ridesharing companies such as Uber and Lyft.

14. Ridesharing Works for Austin, a political action committee supported by Uber and Lyft, launched a petition drive for an alternative ordinance that would repeal the city's fingerprint check requirement.

15. Ridesharing Works for Austin submitted more than the 20,000 petition signatures necessary to place the fingerprint check requirement for ride-hailing drivers on a special election ballot.

16. After certification of the petition signatures by the Clerk of the City of Austin, a special election was scheduled for May 7, 2016 to consider what appears on the ballot as Proposition 1 ("Prop 1").  Early voting began on April 25, 2016 and concluded on May 3, 2016.

17. According to campaign finance reports released on Friday, April 29, 2016, to

---

Report and Order, 18 FCC Rcd 14014, 14092-93, para. 133 (2003) (2003 TCPA Order).  Predictive dialers use automated equipment to dial numbers (either from lists or randomly or sequentially) and then connect the called party to a live person. The distinctive element of a predictive dialer is software that predicts calling patterns to minimize the time live agents spend between calls while also minimizing the incidence of individuals answering a call when no agent is available.  The FCC has further emphasized that the capacity of a dialing system is not limited to any current configuration or present ability but also includes potential functionalities that are more than mere theoretical possibilities.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, 30 FCC Rcd 7961, 7974-77, paras. 15-21 (2015).  The FCC clearly determined that Internet-to-phone text messaging technology and text messaging apps that send to all or virtually all text-capable U.S. phone numbers constitute autodialers.  *Id.* at 8017-22, paras. 108-22.

promote its support of Prop 1, Uber and Lyft have spent an estimated $8.1 million backing the Prop 1 measure.

### "CAMERON FROM UBER" SENDS A TEXT MESSAGE TO THE PLAINTIFF ABOUT VOTING "FOR" PROP 1— "JEFFREY FROM UBER" AND "MIKE FROM UBER" AND "JEFF FROM UBER" BEGIN SENDING TEXT MESSAGES TO OTHER AUSTIN RESIDENTS URGING THEM TO VOTE "FOR" PROP 1, AS WELL

18.  On May 2, 2016, Plaintiff received an unsolicited and unwanted text message from "Cameron from Uber" (phone number 512-900-3818). A screen shot of the text message that "Cameron from Uber" sent to the Plaintiff is depicted here:



19.     While federal law imposes no restrictions on <u>live</u>, <u>manually-dialed</u> political calls or text messages delivered to any landline telephone or cell phone, the text message received by Plaintiff from "Cameron from Uber" has strong indicia of being generated not as part what would be an incredibly complex and tedious live, manually-dialed/manually texted political outreach effort, but rather as part of a robo-texting effort using auto-dial technology by Uber or third parties working at Uber's direction to boost the prospects for passage of Prop 1.  After all, the text sent by "Cameron from Uber" was essentially identical to other text messages sent by other purported representatives from Uber to persons other than the Plaintiff during the same time frame.  For instance, "Jeffrey from Uber" (phone number 737-210-3956) sent a text message on May 2, 2016 (and, after no response, sent a follow up message on May 3, 2016 which again urged the recipient to vote "FOR Prop 1") to another Uber user in Austin containing the identical statement sent by "Cameron from Uber":



20. The only differences between the text message sent by "Cameron from Uber" and "Jeffrey from Uber" are the first names of the person receiving the text and of course, the words "Cameron" and "Jeffrey" as purported senders on behalf of Uber— otherwise the two text messages are identical, including their punctuation and capitalization.

21. "Mike from Uber" (phone number 713-210-4191) also sent the identical text that "Cameron from Uber" sent to the Plaintiff. The recipient of the text message responded and ordered Uber to "STOP" contacting him:



22. Despite the "STOP" response sent to "Mike from Uber" the day prior to the end of early voting, the following day, the text recipient nonetheless received the following push notification from Uber on his cell phone to use UberVOTE to travel to the polls and vote for Prop 1:

8



23.     Notably, UberVOTE is not free to Uber riders unless the riders are first time riders with Uber.³  Thus, this solicitation from Uber occurred after the recipient of Uber's unwanted, unsoliticted text message specifically instructed Uber to "STOP" and cease contact with regard to Prop 1.  Uber wholly ignored this instruction and contacted the Uber user anyway concerning Prop 1, seeking to actually profit from its prior and illegal misconduct.  The disconnect between what the Uber user wanted (an end or "STOP" to messages about Prop 1 on his cell phone), and what he received,

---

³ https://newsroom.uber.com/us-texas/ride-to-the-polls-with-uber-2/

9

(precisely the opposite) is not only indicative of a highly annoying, ill-conceived and intrusive political communication effort, but one that is being run in large part by an autodialer or similar technology rather than manually dialed by actual, living persons as federal law requires when it comes to cell phones.

24.     Further evidence of an autodialer being used by Uber comes from "Jeff from Uber" (phone number 737-210-4986), who also sent the identical, initial text message that "Cameron from Uber" sent to the Plaintiff:



25.     The above response from "Jeff from Uber" completely ignores that "Jeff from Uber" was told by the recipient of the text message that "as a rule [I] never disclose in a survey my vote." *Id.*  Instead, "Jeff from Uber" cluelessly and enthusiastically

responds "Great!" and then provides a link to polling locations to vote. *Id.* The non-sequitur response by "Jeff from Uber", at bare minimum, is curious, abnormal and lacking in the contextual awareness usually afforded by a live person texting with another live person. It is suggestive of a computer-generated text message of the kind prohibited by the TCPA.

26. Moreover, whenever the phone numbers utilized by "Cameron and Jeffrey and Mike and Jeff from Uber" are return dialed by someone desiring to speak with them, none of these persons from Uber can be reached by direct dialing their telephone number—indeed, no human being ever answers calls made to the phone numbers used by "Cameron and Jeffrey and Jeff from Uber" to send out their text messages. There is no busy signal heard in response to any call to their phone numbers, and none of them have any voice mail, either. Instead, all phone calls to "Cameron, Jeffrey and Mike and Jeff from Uber"—even those made immediately after the text message is delivered to the text message recipient—are answered with the identical computer generated message, stating only, in a feminine voice: "We're sorry—an application error has occurred. Goodbye."

27. The automated text messages that Uber sent to Plaintiff were to a cellular telephone number for which Plaintiff is charged for incoming calls and text messages pursuant to 47 U.S.C. § 227(b)(1)(A)(iii). The last four digits of Plaintiff's cellular telephone number are "4352".

28. The text messages that Uber sent were not for an emergency purpose as defined by 47 U.S.C. § 227(b)(1)(A)(i).

11

29.     Under these facts and circumstances, and because it is absurd to imagine that Uber paid individual, living persons to manually type and then manually send thousands (and perhaps tens of thousands) of individual text messages in support of a political campaign underway in Austin, Texas, Plaintiff avers and alleges that Uber sent the text messages at issue via an ATDS or autodialer as defined by 47 U.S.C. § 227(a)(1). The ATDS has the capability to both (1) store or produce telephone numbers to be texted using a random or sequential number generator, and (2) automatically send text messages from a list or database of telephone numbers, without human intervention.

30.     The text messages from Uber also constitute artificial or prerecorded voice calls pursuant to 47 U.S.C. § 227(b)(1).

31.     The automated text messages that Uber sent to Plaintiff were sent without Plaintiff's prior express consent and without the Plaintiff's prior express written consent.

32.     The automated text messages that Uber sent to Plaintiff were advertising and/or telemarketing, as defined by 47 C.F.R. § 64.1200.

33.     Plaintiff alleges that each text message she received from Uber violated 47 U.S.C. § 227(b)(1).

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action on behalf of herself and a class of all others similarly situated, defined as follows:

All persons domiciled within the city limits of Austin, Texas who, after providing Uber with their cellular telephone number to enroll as an Uber rider, received a non-emergency text message from Uber on their cellular telephone, without their prior

12

express consent, via an ATDS, that references voting for Prop 1 set for special election on May 7, 2016 in Austin, Texas.

35.     Defendant and its employees or agents are excluded from the Class.

36.     Members of the Class are so numerous that joinder is impracticable. While the exact number of class members is unknown to the Plaintiff, it is believed that the Class is comprised of thousands of members who are Uber users geographically disbursed within the Austin, Texas city limits.  The Class is readily identifiable from information and records in the possession of Uber and third parties.

37.     Common questions of law and fact exist as to all members of the Class. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Class. Such common and legal factual questions include:

   a.     Whether the Defendant's conduct violates the TCPA;

   b.     Whether the Defendant's text messages were sent for an emergency purpose;

   c.     Whether the Defendant obtained valid express consent from the automated text message recipients;

   d.     Whether Defendant adhered to requests by Class members to stop sending text messages;

   e.     Whether the Defendant keeps records of text message recipients who revoked consent to receive text messages;

   f.     Whether Plaintiff and members of the Class are entitled to damages, costs, or attorney's fees from Defendant;

  g. Whether Defendant violated the privacy rights of Plaintiff and members of the Class;

  h. Whether Defendant's conduct caused Plaintiff and members of the Class inconvenience or annoyance;

  i. Whether Plaintiff and members of the Class are entitled to compensatory damages;

  j. Whether Plaintiffs and members of the Class are entitled to treble damages based on the willfulness of Defendant's conduct;

  k. Whether Plaintiff and members of the Class are entitled to a permanent injunction enjoining Defendant from continuing to engage in its unlawful conduct;

38. Plaintiff's claims are typical of the members of the Class as all members of the Class are similarly affected by the Defendant's actionable conduct. Defendant's conduct that gave rise to the claims of Plaintiff and members of the Class (i.e. using an autodialer to send unsolicited text messages to cellular phones owned by Plaintiff and members of the Class) is the same for all members of the Class.

39. Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent. Specifically, the proposed Class is not exclusive to persons who happen to be supporters or opponents of Proposition 1—rather the Class encompasses both supporters and opponents of Proposition 1. Furthermore, Plaintiff has retained competent and experienced counsel to represent her and the Class.

40. Class action treatment is a superior method for the fair and efficient

adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

41.	Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

42.	Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**Violation of the Telephone Consumer Protection Act (47 U.S.C. § 227 et seq.)**

43.	Plaintiff incorporates by reference all above paragraphs as though fully repeated herein.

44.	The TCPA prohibits the use of an ATDS or autodialer to make any call or send any text message to a wireless phone number without the prior express consent of the contacted party or in the absence of an emergency.

45.	The foregoing acts and omissions of Defendant constitute numerous and multiple violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

46. As a result of Uber's violations of 47 U.S.C. § 227 et seq., Plaintiff and members of the Class are entitled to an award of $500.00 in statutory damages, for each and every negligent violation, pursuant to 47 U.S.C. § 227(b)(3).

47. As a result of Uber's violations of 47 U.S.C. § 227 et seq., Plaintiff and members of the Class are entitled to an award of $1,500.00 in statutory damages, for each and every knowing and/or willful violation, pursuant to 47 U.S.C. § 227(b)(3).

48. Plaintiffs and members of the Class also suffered damages in the form of invasion of privacy, in addition to text message, data, and other charges to their cellular telephone plans.

49. Plaintiff and members of the Class are also entitled to and seek injunctive relief prohibiting Uber's illegal conduct in the future.

## JURY DEMAND

50. In accordance with FEDERAL RULE OF CIVIL PROCEDURE 38(b), Plaintiff hereby demands a trial by jury on all issues triable to a jury.

## PRAYER

51. WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment as follows:

   1. Statutory damages of $500.00 for each negligent violation of the TCPA;

   2. Statutory damages of $1,500.00 for each knowing or willful violation of the TCPA;

   3. Actual and punitive damages arising from Defendant's wrongful and illegal conduct;

4. A permanent injunction prohibiting Defendant from sending text messages via the use of an ATDS or autodialer without recipients' prior express consent;

5. Attorney's fees;

6. Litigation expenses and costs of the instant suit;

7. Forfeiture penalties of up to $16,000 per violation[4] of the TCPA and referral of any judgment issued by this Court in favor of the Plaintiff and/or the Class to the FCC Enforcement Bureau for notice and/or enforcement of the same; and

8. Such other or further relief as the Court deems proper.

---

[4] This amount reflects inflation adjustments to the forfeitures specified in 47 U.S.C. § 503(b)(2)(D). Section 503(b)(2)(D) provides for forfeitures of up to $10,000 for each violation by a person who is not a broadcast station licensee, cable operator, common carrier, or applicant for any broadcast station, cable operator, or common carrier license issued by the FCC. The FEDERAL CIVIL PENALTIES INFLATION ADJUSTMENT ACT of 1990, Pub. L. No. 101-410, 104 Stat. 890, as amended by the DEBT COLLECTION IMPROVEMENT ACT of 1996, Pub. L. No. 104-134, Sec. 31001, 110 Stat. 1321 (DCIA), requires the Commission to adjust its forfeiture penalties periodically for inflation. *See* 28 U.S.C. § 2461 note (4). The Commission most recently adjusted its penalties to account for inflation in 2013. *See* Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation, 28 FCC Rcd 10785, 10786-790, paras. 3-5 (EB 2013); *see also* Inflation Adjustment of Maximum Forfeiture Penalties, 78 FED. REG. 49370–01, 49370 (2013) (setting September 13, 2013, as the effective date for the increases). The Commission has made such inflation adjustments and the current maximum forfeiture is $16,000 for each violation under Section 503(b)(2)(D). *See* Inflation Adjustment of Maximum Forfeiture Penalties, 78 FED. REG. at 49371.

Respectfully Submitted,

**TERRY & THWEATT, P.C.**

By: <u>/s/ L. Lee Thweatt</u>
L. Lee Thweatt
Texas Bar No. 24008160
Federal I.D. No. 36618
Joseph D. Terry
Texas Bar No.  24013618
Federal Bar No. 24206
One Greenway Plaza, Suite 100
Houston, Texas  77046-0102
(713) 600-4710 (Telephone)
(713) 600-4706 (Telecopier)
lthweatt@terrythweatt.com
jterry@terrythweatt.com

**ATTORNEYS FOR PLAINTIFF**